This is the next case, R.J. Power Plumbing & Heating v. Workers' Comm'n, 411-0669. Counsel, please. May it please the Court, Counsel. My name is Matt Brewer. I'm here today on behalf of R.J. Power, the appellant. If I may, I'd like to briefly go through some of the facts that tell us some of the extensive procedural history in this matter. As you're very well aware, I'm sure, the petitioner was a journeyman plumber and pipe fitter who injured his right elbow on August 23, 2003 when turning a 4-inch PVC pipe. He subsequently underwent some treatment, had an MRI, and came under the care of Dr. Greeden. Dr. Greeden initially performed some injections and had the petitioner undergo some physical therapy. Conservative treatment had shown to fail, and therefore surgery was performed in December of 2003. Following the initial surgery, the petitioner continued to experience pain problems in regards to his right elbow. An EMG was performed, which showed some neuropathy in that arm and in that hand. Dr. Greeden later went back and performed a right radial release in June of 2004. On January 24, 2005, Dr. Greeden released the petitioner at maximum medical improvement with permanent restrictions. Dr. Greeden was of the opinion that both surgeries and all the treatment that the petitioner had underwent were in fact related to his work injury of August 2003. Throughout this process, the petitioner had also been seen by Dr. Crandall in St. Louis for various IMEs. Dr. Crandall was of the opinion that the petitioner's initial surgery was not related to his work accident. However, the subsequent surgery from June of 2004, which dealt with the petitioner's diagnosis of epicondylitis, was in fact related. Now, as far as the procedural history in this matter is concerned, this case was initially tried on a bifurcated 19B, which occurred in both March and July of 2005. The result of that initial 19B hearing was the petitioner was awarded TTD benefits, medical expenses, as well as was ordered to undergo vocational rehabilitation. While on appeal of this initial 19B, a second 19B was filed, wherein the petitioner requested an additional time period of TTD benefits. The petitioner was again awarded these additional benefits in the second 19B. Both of these decisions were appealed to the Commission, which they were both affirmed. Thereafter, the cases were consolidated and were brought before the Circuit Court. The Circuit Court affirmed that decision, and thereafter the cases again appealed to this Court. This Court affirmed that decision in regards to the issues of accident, causation, and TTD benefits. However, the ongoing maintenance benefits that were awarded were reversed, and this Court felt that a determination under Section 8D1 as far as a wage differential was more appropriate, and the cases were remanded back to the arbitration level for further proceedings. And the Commission awarded a wage differential, correct? Yes, they did, Your Honor. That's your first issue that you're contesting, correct? Correct, Your Honor. As you had just said, they awarded not only a wage differential, but also a short period of maintenance benefits as well as a medical bill. The Commission affirmed this decision. Again, this case was appealed to the Circuit Court, to where it was also affirmed, however, the issue of the $100 medical bill with Dr. Frieden for the, I believe, March of 2009 visit the petitioner had with him was overruled. So why isn't the claimant entitled to a wage differential? Your Honor, the claim is not entitled to a wage differential in my opinion for several reasons. As you know, Section 8D1 essentially says that when a petitioner is partially incapacitated from returning to their usual customary line of employment, they would be entitled to two-thirds the difference in the amount they would be making in their usual line of employment and what they were making following their injury. Now, there are several issues clearly that are stated within that. The threshold issue is, is the petitioner partially incapacitated? Right, that's the first part of it. Excuse me, Your Honor? That's the first part of the two prompts. And if we were to believe Dr. Frieden's restrictions, then I don't think there's any dispute that he would be partially incapacitated and that issue would be, that portion, that element of 8D1 would be met. Beyond that, he has to show an impairment of earnings. I personally don't believe that an argument can be made based on the information in the record that there was not an impairment of earnings. He clearly established that he was making roughly $1,300 a week as a plumber pipe fitter. However, when he was working at Haas in the Cove as a bartender, he was making significantly less. My argument, Your Honors, is that the issue in this case decides on whether the employment he found when he had gone back to work was suitable employment. And that is where I believe the Commission has missed this decision, and I believe that is where the wage differential, in fact, was not appropriate. Now, in regards to suitable employment, just a simple reading of 8D1 will initially bring up some questions. What is suitable employment? What are earnings in a subsequent job that would be considered suitable underneath the act, underneath the case law? I believe that the case law has shown some guidance in regards to giving a definition of what suitable employment may be. The first thing I think can be looked at, and this is in a case of Fernandez versus the Industrial Commission, is the subsequent job the petitioner began work in, is it within a range that was set forth by a vocational rehabilitation counselor or a labor market certainty? Now, as you know, the petitioner's vocational rehabilitation specialist, Mrs. Dolores Gonzalez, admitted to the court in this case. Now, her opinion was that this did fall within the range that he could obtain, correct? I don't believe so, Your Honor. I believe Mrs. Gonzalez's report says that there is no stable labor market for her, or for the petitioner, and that he is an odd lot per total. Now, the employer had a vocational rehabilitation expert, right? That's correct. And your expert said that he was likely restricted to a range of $6.50 an hour to $8 an hour, right? Correct, Your Honor. Even if he'd never gone to work anywhere, couldn't the commission have based their decision on a wage differential on your expert's testimony? I believe they could, Your Honor, but I think if you look deeper into Mrs. King's report, she also sets forth I mean, if he just has to show an impairment of earnings, didn't he show it through your expert? I don't believe so, Your Honor. I believe he can show his impairment of earnings, but I also believe that he has to show that the employment that he undergoes following has to be suitable. Well, what if he had never found a job? What if he hadn't found a job at all, and they just based it on your expert's report? Then I believe it would not be under 8D1 at all, Your Honor. It would be under an entirely separate section. It would most likely be a – it would be essentially an odd lot per total, which, based on his work history and his ability to maintain a job, I do not believe that's appropriate. Well, you keep using the term suitable employment. How do you define it in the context that we have? What does suitable mean? And that's what I believe some of the cases are, and that's what I'm trying to express right now. Is there a definition of suitable you can call a retention to? There is not a strict definition of suitable employment in any of the cases, Your Honor. Isn't one of the things that's troubling you at all, Kander, is that there was no real job search done in this case? He just lands as a bartender, right? Yes, Your Honor. But does the law prohibit that? It does not, Your Honor. However, I think if you take a look, and another one of the factors that some of the cases have pointed out to is a claimant's effort to get back to work. And that plays directly into his lack of or any diligence with a job search that was conducted. But does he have an obligation to even conduct a job search? He does not, Your Honor. And I readily admit that the Gallinetti case says that the diligence of a job search is not required. However, that case also does say that the diligence of a job search will be looked at as a factor in whether he has actually suffered an impairment of earnings. It's not required, but it is a factor, and that is our contention, Your Honor, is that with all of the factors in regards to his effort, the fact that he... The petitioner makes an argument that he was in financial dire straits, and that's why he continued to work as a bartender, which is completely understandable. That makes perfect sense. However, if you were making... he's only making $300 a week. He testified that he was making $8.50 an hour, working about 40 to 45 hours a week at the time of the permanency hearing, which puts him in an average weekly wage range of roughly $330 to $350. And he's making almost $1,300 or over $1,300 as a plumber pipe fitter. But you're not saying he can go back to being a plumber pipe fitter, are you? No, Your Honor. Your expert says he can't do that. Correct. I don't believe he can go back if you take Dr. Greeden's restrictions. However, our contention is that his lack of effort and his inability to search for a job, he could have done more. And he could have essentially found the suitable employment, which we believe under 8B1, is in that it states that suitable employment for the very reason to mitigate wage loss in a direct correlation with the facts in this case. He's actually making more money an hour than your expert projected he could earn. Your Honor, I believe our expert projected that he could perform several different jobs where he would be making upwards of $40,000 to $50,000 contained in Mrs. Kane's report. She sets forth, I believe, eight or nine positions wherein he could be making much more than he could make as a bartender at both Hobbs and the Cove. And that is our argument, Your Honor, is that our vocational expert made the argument and set forth that he is underemployed. I mean, she says in her report that he is underemployed. She testified, too, at the time of trial that he's underemployed. Well, we have two components. We have wage that he's earning and hours that he's working, right? Correct, Your Honor. And how many hours is he working? He testified that he was working anywhere from 40 to 45 hours out of the permanent tenure. He initially, I believe, started making $7 an hour. He moved up at a later time to making about $80.50 an hour. And that is where my $330 to $350 calculation of an average wage came in. Here's what I'm struggling with a little bit is this argument that he could have done more. Could we announce a decision that the claimant's wage differential could be reversed because he could have done more? How do we define that he could have done more? I think you define that, Your Honor, by the vocational rehabilitation information that has been submitted at the trial. Mrs. Cain submitted a thorough report. She looked at his work history. And granted, yes, he has a high school education. He was a 30-year plumber pipe cleaner. But she stated in her report that he had not only underemployed, but his capabilities and his transferable skills put him in a situation to where he would be able to make much more. Now, you can't just, I guess, have a blank, say, you can do more. Right. But if we have a specialist who's taken a look at all the facts, looked at everything, looked at his restrictions, understands the case, and she says, you can make this much, but you're settling and you're not trying, and you haven't performed a job search. So you haven't made an effort to really get back into the workforce. I mean, he testified himself that when HODs had closed, he didn't apply for another position. He simply walked into the cove and was given a job working every other Sunday initially. He subsequently was given a job full-time. And that is our argument, Your Honor, is that consistent with Mrs. Cain's report and his lack of effort. And if you take a look at the work-hardening notes, it states directly in there that it is the petitioner's lack of motivation to get back in the workforce, which is holding him back. And we think that, you know, to a certain extent, we play right into Mrs. Cain's report that he is underemployed and also the fact of no additional job search once HODs had closed. The last thing, though, I'd like to address, Your Honor, is the maintenance benefits at Cain. Now, as we have discussed here today, the petitioner worked at HODs. I believe the final day he worked there was November 21st of 2007. He begins working at the cove full-time on January 22nd, 2008. In that two-month span, he testified to on cross-examination at the permanency hearing that he conducted no additional job search in that two-month span. He stated that he walked into the cove and was given a position. Did the employer help him in? No, Your Honor, the employer did not. And we understand that the Roper decision states that in order to get maintenance, vocational rehabilitation is required. Now, I will be the first one to admit, and there is no dispute, that the employer did not provide any vocational rehabilitation assistance. However, in this case, which Mr. Harris had before, a claimant can undergo a self-directed job search and thereby take part in vocational rehabilitation on his own, which he had in the past. And once HODS had closed, he did not do that. There was no evidence of an additional job search following HODS closing. And the claimant himself admitted, I didn't look for any more jobs. I walked into the cove and was given a position. And thereby, Your Honor, we don't believe that vocational rehabilitation was being performed and thereby maintenance benefits would not be appropriate for that period of time. Thank you. Counsel, please. Thank you, Your Honor. Counsel to the Court. May it please the Court, my name is John Bishardi. I'm here on behalf of the employee. The issues presented before the Court today are whether the award of the wage differential is against the manifest way of the evidence. The Commission made a unanimous ruling that a wage differential was appropriate and the evidence submitted by the employee was sufficient to prove a wage diminution. Dr. Greening's restrictions, as we pointed out in our brief, were considered by the Commission again and they found again that his restrictions were more credible and followed his restrictions. You are correct that the only expert evidence in this case regarding his ability to earn wages all established that he could earn less than he actually was earning. There is, I think we've cited all the law in the case that I think controls this issue, there is no requirement that he conduct a job search, even though he did. This gentleman... He did conduct a job search? He looked for work once he lost his position. He did it to the best of his ability. Did he conduct a formalized job search? No, he didn't. He networked, and that's part of a legitimate job search. This is a gentleman who is a 60-year-old person. He's worked in the pipe fitting trades and no vocational rehabilitation was offered by the respondent, the employer here, at any time. And these networking efforts are in the record somewhere? I think that his... Were he testified to it? His record, his testimony was that he just conducted, he went to this other employer and he asked for a position there. They had him on a trial basis. That's vocational rehabilitation. Vocational rehabilitation is a vague, vague term. This gentleman used the skills that he had and the experience that he had to try to get back to a place where he could earn wages because he needed to. He's had no money for seven years, no wages that he was accustomed to earning. There's been no payment of maintenance benefits. There's been no payment of temporary disability benefits. There's been no provision of vocational rehabilitation. He did what he could. He found suitable employment. He found employment that paid him wages. There's no requirement that he find suitable employment. Ms. Cain's testimony that he's underemployed is not a factor for the commission to take into account. She could identify no positions which he could find employment at, no positions that he had skills to perform. He was, and the law says that in a wage differential you use the actual earnings, not something that's speculative. He might, if we open this up to speculation, then there may be other types of evidence that could come in that would be equally speculative. He might lose his position and then have no earnings in the future. That's the reason why the law looks to actual earnings. As we've cited with Gallaudet, there is no requirement that a job search per se be undertaken, as long as the injured worker can demonstrate a diminution of wages, and he's done that here. He's done that on two occasions. He's demonstrated that he's tried to survive and find some wages to earn. That's all he's been able to do. He's been able to find no better job because he doesn't have the skills to do so. The commission made a unanimous finding that he was entitled to a wage differential. It is a manifest rate issue. I don't believe there is any evidence that would justify a reversal of that decision. I think the manifest rate of the evidence supports that. With respect to the eight- and five-seventh-week period of TTD, he was, in fact, in a vocational rehabilitation plan that he was conducting himself. He worked every other Sunday, one day, as a tryout basis with this new employer before he was hired. That's a vocational rehabilitation plan. The majority of the commission found that that did not preclude an award of maintenance because the ability to earn occasional wages does not prevent the finding of maintenance. There is no evidence in the record that he was actually being paid. What he testified to was that he was being tried out. The majority of the commission's decision found that that was not a bar to the award of maintenance for that time period. We believe that decision, as well, is subject to the manifest rate of the evidence standard. And for that reason, the majority of the commission's finding, of course, Commissioner Lindsay dissented and found that she didn't believe that this was an occasional wage type situation or else that she just mentioned that it was occasional wages and that that finding was speculative. I don't think it was. I think the commission's finding of fact there should be affirmed. We would ask that the court affirm the commission's decision. If there's any questions, thank you. The panel, please. Just a moment, Your Honor. I would just like to follow up with, I'm not sure there's any specific testimony within the record that the petitioner was involved in any networking, Your Honor. And as counsel had pointed out, I would direct your attention to Commissioner Lindsay's dissent. The most recent commission decision is she agrees with the employer in this case that there was no job search. There was no active attempt at vocational rehabilitation for the eight and five-sevenths weeks. And therefore, we do not believe that maintenance is warranted for that additional time period. Thank you. The court will take the matter under advisement for disposition to stand on recess for a short period.